**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND/ODESSA DIVISION**

| | | |
|---|---|---|
| **FRANCES ARREDONDO and SAGE COLEMAN,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **MO:20-CV-00200-DC** |
| | § | |
| **SCHLUMBERGER LTD and** | § | |
| **ELWOOD STAFFING SERVICES, INC.,** | § | |
| *Defendants*. | § | |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BEFORE THE COURT is the Motion for Summary Judgment filed by Defendants Schlumberger LTD[1] (Schlumberger) and Elwood Staffing Services, Inc. (Elwood) (together, Defendants) on October 4, 2021. (Doc. 27). Plaintiffs Frances Arredondo (Arredondo) and Sage Coleman (Coleman) (together, Plaintiffs) filed a response on October 22, 2021. (Doc. 31). Defendants filed a reply in support of their Motion on October 29, 2021, and Plaintiffs filed a sur-reply on November 12, 2021. (Docs. 32, 34). After due consideration of the parties' arguments, the record, and the applicable law, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Doc. 27).

### I.    FACTUAL BACKGROUND

This case stems from Plaintiffs' employment with Defendants. The summary judgment record establishes the following.

Elwood is a staffing agency that employed Plaintiffs to provide services for Schlumberger, Elwood's client company, in Midland, Texas. *See* Niedermeyer Decl. at 1. Arredondo is a Hispanic female, and Sage Coleman (now Sage Scott) is an African American

---

1. Defendant Schlumberger LTD is also known as Schlumberger Technology Corporation. (Doc. 28-1 at 1).

female. *See* Coleman Dep. 19:24–20:1, 20:10–17. Plaintiffs began working at Schlumberger's gun shop facility in Midland in May 2018. *See* Niedermeyer Decl. at 1.

Arredondo completed onboarding documents on April 25, 2018. *See* Niedermeyer Decl. Ex. 6-B, 6-E. However, before applying with Elwood, Arredondo was required to undergo an onsite interview with Schlumberger's gun shop supervisor, Maritza Carrasco (Carrasco). *See* Arredondo Dep. 134:4–7. Carrasco offered Arredondo the "gun loader"[2] position at $18.50 per hour. *Id.* at 135:7–10. Arredondo began her work assignment as a gun loader on May 28, 2018. *See* Niedermeyer Decl. at 1.

Elwood recruited Coleman through a job fair in Louisiana. *See* Coleman Aff. 1.  She was hired for the "gun loader trainee" position at Schlumberger's Midland gun shop. *Id.*  Coleman completed onboarding documents on April 18, 2018. *See* Niedermeyer Decl. Ex. 6-A, 6-D. Coleman began her assignment on May 30, 2018. *See* Niedermeyer Decl. at 1.

Both Plaintiffs received Elwood's Associate Handbook and Schlumberger's Harassment-Free Workplace Policy. *Id.* Plaintiffs were scheduled to work for 14 days and were given seven days off. *See* Coleman Dep. 44:17–23; Arredondo Dep. 128:10–12. Schlumberger provided housing and transportation. *See* Arredondo Dep. 141:18–22.

When Plaintiffs began working at the gun shop, Carrasco, a Hispanic female, was the gun shop manager, and Brenda Mitre (Mitre), also a Hispanic female, was an employee. *See* Niedermeyer Decl. at 1. Although a senior gun loader, Mitre did not hold a supervisory or management position, nor did she have the authority to take any personnel action. *See* Bol Decl. at 1. Carrasco introduced herself, Mitre, and a gentleman, to Arredondo as "supervisors of the

---

2. Plaintiffs explain that "[a] gun loader builds and loads explosive materials into guns used for fracking in order to locate and access petroleum deposits." (Doc. 28-1 at 2).

[gun] shop." *See* Arredondo Dep. 140:1–5. Carrasco also advised Coleman that Mitre was a supervisor. *See* Coleman Dep. 34:24–35:23.

Coleman testified that Mitre sexually harassed her during her four-week assignment with Schlumberger. *See* Coleman Dep. 40:1–43:5. During the first incident, Coleman was sitting at a table with Lee Thomas (Thomas), Adriane Colon (Colon), and Katon Arceneaux (Arceneaux). *Id.* at 40:11–41:12. Coleman, Thomas, Colon, and Arceneaux were discussing Bourbon Street in New Orleans when Mitre joined the conversation stating that she enjoyed the "stripper places" on Bourbon Street and that she liked women with "big breasts and big butts shaped like [Coleman's]." *See id.* at 40:14–22. Mitre also told Coleman that Mitre "would know what to do with a woman like [Coleman]." *Id.* at 40:22–25. Mitre asked Coleman whether Coleman was bisexual and whether Coleman would be willing to try being bisexual; Coleman said "no," noting that she was married to a man. *Id.* at 40:23–41:4. Mitre twice asked whether Coleman was sure, and Coleman assured Mitre both times that she was sure.[3] *Id.* 41:4–12. Thomas advised Coleman to report Mitre's comments to human resources (HR); however, Coleman did not do so because she was "scared that the company would terminate [her]." *See* Niedermeyer Decl. Ex. 6-F.

After that, Coleman asserts that Mitre would pat her on the shoulder and touch her hands while Coleman was building guns. *See* Coleman Dep. 41:21–42:7. Coleman responded by telling Mitre that she did not need help completing her work. *Id.* Finally, Coleman testified that after Mitre engaged in the above-detailed conduct, Mitre made it a point to be around Coleman. *Id.* 42:18–22. During Coleman's employment, Mitre also told Coleman that she and a female co-

---

3. Coleman provided a similar story via email on July 2, 2018. *See* Niedermeyer Decl. Ex. 6-F. The incident report itself is dated June 30, 2018. *Id.*

worker had sex with the same women[4] and that she and a former employee went to strip clubs together. *See* Niedermeyer Decl. Ex. 6-F.

After completing her 14-day shift and before starting her seven days off, Coleman informed Carrasco that she did not want to work during the day shift because she did not want to work with Mitre. *See* Coleman Dep. 45:18–46:15. Coleman did not tell Carrasco why she did not want to work with Mitre. *See id.* at 46:8–15. Carrasco agreed to let Coleman work during the night shift. *Id.* at 45:22–24. However, when Coleman returned for her next 14-day shift, Carrasco informed Coleman, without explanation, that Coleman would continue working days. *Id.*

On June 22, 2018, Coleman filed her first complaint against Mitre to Schlumberger. *See* Mitcham Dep. 25:6–24. Coleman went to Kimberly Mitcham (Mitcham), an office administrator, to pick up her employee badge, and Mitcham asked Coleman how she was doing. *See* Mitcham Dep. 21:3–8. Coleman communicated to Mitcham the incident with Mitre. *See* Coleman Dep. 47:16–20, 48:4–22; Mitcham Dep. 21:3–25. Mitcham advised Coleman to speak with HR, and Mitcham herself reported Coleman's complaint to her managers, Shane Morgan (Morgan) and Mike.[5] *See* Mitcham Dep. 22:2–19. Coleman's complaint was then reported to HR employee Ali Mendha (Mendha). *See id.* Mitcham also submitted Coleman's complaint to Mendha via email the same day. *See* Pls.' Ex. 5a.

The report from Coleman noted that Carrasco and Mitre "favor[ed]" Hispanic employees and Mitre's sexually-charged comments toward Coleman. *Id.* Included in Mitcham's report to HR were other complaints against Carrasco. *Id.* Mitcham included a complaint from John Sonuga (Sonuga), who claimed that Carrasco had spoken to him in a derogatory manner in front of other employees, and Lance Sigue (Sigue), who had an issue with Carrasco because Carrasco

---

4. Coleman specifically alleged that Mitre told her and other employees that she and a female co-worker "f*** the same b****es." *See* Niedermeyer Decl. Ex. 6-F.
5. Mike's last name is not included in Mitcham's deposition testimony.

spoke to employees in a demeaning way. *Id.* Mitcham also noted that Carrasco had "a history of treating employees this way" and that the complaints listed in her email were not the first she received. *Id.* Mitcham indicated that Carrasco was why another employee, Andy Zimarron (Zimarron), left the company. *Id.*

From June 22, 2018, to June 29, 2018, Mendha investigated the incidents reported. *See* Defs.' Ex. 9. In his investigation summary, Mendha noted why the investigation was initiated—there were complaints against senior gun loaders' demeaning and disrespectful attitude toward new employees. *Id.*

During Mendha's investigation, additional complaints were made. *Id.* Specifically, Coleman was accused of making disparaging remarks regarding a co-worker and Carrasco's sexuality and weight. *Id.* Three different individuals and Carrasco corroborated the claims against Coleman.[6] *Id.* Mitre was accused of being disrespectful and demeaning toward co-workers. *Id.* It also came to light that Arceneaux had sexually harassed Arredondo. *Id.* When the investigation summary was drafted, Mendha was still investigating the sexual harassment accusation against Arceneaux, who was no longer working in the gun shop. *Id.* Finally, another employee, Beyonce Echeverria (Echeverria), also reported being subjected to harassment by Sigue in the form of sexual jokes and comments. *Id.* However, the allegation could not be corroborated. *Id.* Likewise, Coleman's complaints regarding Mitre could not be verified. *Id.*

After Coleman spoke with Mendha, Coleman denied making remarks concerning Carrasco's weight or sexuality. *See* Coleman Dep. 57:16–58:6.

As a result of Mendha's investigation, Mitre was given a written warning for unprofessional and disrespectful behavior. *Id.*; *see also* Carrasco Decl. Ex. 4-A. Moreover,

---

6. Defendants claim that the accusation was corroborated specifically by Echeverria, Carrasco, Arredondo, and Mitre, citing documents dated July 3, 2018, and July 5, 2018. (Doc. 27 at 6) (citing Defs.' Ex. 9, 10). It appears Mendha asked employees to put their complaints on paper after the investigation took place.

Mendha recommended releasing Coleman and that respect and professionalism training be conducted and made mandatory for all gun shop staff, outside of other mandatory training on the topic. *Id.* The additional training was scheduled for July 17, 2018. *Id.*

Coleman was released to Elwood effective June 29, 2018, for violation of Schlumberger's policy. *See* Defs.' Ex. 11; *see also* Niedermeyer Decl. at 2. That same day, Milae Fish (Fish), Elwood's employee, was notified for the first time that Coleman had been subjected to sexual comments from Mitre. *See* Niedermeyer Decl. at 2.

Fish spoke with Coleman on June 29, 2018. *See* Coleman Dep. 68:8–21. During Coleman's first conversation with Fish, Coleman did not inform Fish of the sex- and race-based allegations she raised to Schlumberger. *See id.* Rather, Coleman explained that her flight to Louisiana had been changed from July 4 to June 29, and that she was not sure why that had happened. *Id.* Fish called Coleman back the same day and informed her that Schlumberger had released Coleman. *Id.* Coleman then relayed the harassment she experienced at the gun shop. *Id.* at 69:3–19. Fish asked Coleman to write a statement. *Id.* at 75:3–9.

The incident report submitted to Elwood on July 2, 2018, reiterates Coleman's accusations against Mitre. *See* Niedermeyer Decl. Ex. 6-F. Coleman also noted that although she asked management to teach her how to use certain equipment, management refused even though Arredondo, who started on the same day as Coleman, was trained and allowed to use the equipment. *Id.* Additionally, Coleman indicated that Carrasco, Mitre, and another employee spoke Spanish even though they were required to speak English and spoke poorly "about other workers" in Spanish. *Id.*

Elwood also received a statement from Thomas, who Coleman identified as a witness. *See* Niedermeyer Decl. Ex. 6-H. Thomas corroborated Coleman's account of Mitre's harassment

of Coleman. *Id.* Thomas also indicated that he left Schlumberger on June 13, 2018, because he found the gun shop unorganized and believed the "supervisors" segregated certain employees. *Id.* Specifically, Thomas stated that supervisors sent "all the black guys to the back and [left] everyone else in front of the gun shop." *Id.*

Fish advised Coleman to report to an Elwood office in Lafayette, Louisiana since Coleman lived there. *See* Coleman Dep. 87:25–88:3. Coleman reached out to the Lafayette office; it advised her to review their website for potential assignments. *Id.* at 124:9–23. However, Coleman could not find work assignments with the per diem she desired. *Id.* at 124:24–125:1. Coleman began searching for a new job by the end of July and the beginning of August. *Id.* at 88:5–11.

Arredondo also alleges that Mitre sexually harassed her. Arredondo specifies that Mitre began inviting her to lunch with Carrasco and/or Echeverria during her third week at the gun shop. *See* Arredondo Dep. 120:21–124:1. While having lunch at McAlister's, Mitre tried touching Arredondo's leg and holding her hand. *Id.* at 124:10–15. Carrasco was sitting next to Mitre, but Arredondo is not sure that Carrasco saw Mitre's advances. *Id.* at 124:16–18. Arredondo declined invitations to lunch, but Carrasco and Mitre insisted that Arredondo join them. *Id.* at 126:5–13.

Arredondo further stated that on June 15, 2018, she went to dinner after work hours with Echeverria and Mitre at Corona's Sports Bar in Odessa, Texas. *Id.* at 55:1–4. While Arredondo was in a hallway waiting to use the restroom at the sports bar, Mitre pinned Arredondo against the wall and kissed her. *Id.* at 54:9–25, 58:2–59:7. Arredondo tried to push Mitre away, but she could not get away. *See id.* Arredondo also told Mitre to stop. *Id.* at 59:8–9. After Mitre let Arredondo go, she told Arredondo not to tell anybody because Mitre would lose her job, and she

would make sure that Arredondo too lost her work assignment with Schlumberger. *Id.* at 63:8–13. Mitre testified that the reason she told Arredondo not to disclose their "sentimental relationship" was to avoid being terminated for treating Arredondo more favorably due to the women's relationship. *See* Mitre Dep. 60:13–23.

After the June 15 incident, Arredondo claims Mitre grabbed her by the arm, pulled her, and dug her nails in Arredondo's arms. *See* Arredondo Dep. 64:2–4. On several occasions, Mitre pushed Arredondo "almost" daily. *Id.* at 65:4–23. Arredondo only reported Mitre's conduct to Carrasco. *Id.* at 66:20–25.

On or about June 23, Arredondo finished work at noon. *Id.* at 73:1–7. Schlumberger typically provides transportation to employees, so Arredondo relied on Schlumberger to get to and from work. *Id.* However, on June 23, transportation was not available. *Id.* As a result, Mitre offered Arredondo a ride home. *Id.* at 73:8–13. Arredondo initially declined the ride, but she did not want to wait until transportation through Schlumberger became available, so she accepted Mitre's offer. *Id.*

Rather than drive Arredondo home, Mitre went to a restaurant for lunch. *Id.* at 74:19–25. Arredondo told Mitre that she did not want to have lunch, but Mitre insisted that she would be quick. *Id.* At the restaurant, Arredondo had lunch and one alcoholic drink. *Id.* at 77:7–11. Arredondo could not recall what happened when she and Mitre left the restaurant. *Id.* at 78:8–79:7. Instead, Arredondo remembers waking up during the nighttime, with a foggy memory, and naked in Mitre's home. *Id.* at 79:20–21, 83:10–15. She looked around, noticed her clothes on the floor, and asked Mitre what had happened. *Id.* at 83:17–24. Mitre retrieved a sex toy from a drawer and told Arredondo that she used the toy on Arredondo. *Id.* Mitre threatened Arredondo with disclosing pictures Mitre allegedly took of Arredondo if Arredondo told anyone about the

alleged assault. *Id.* Mitre also threatened Arredondo by telling her she knew where Arredondo's daughter lived. *Id.* at 68:16–21. Arredondo grabbed her clothes, got dressed, and Mitre drove her back to Schlumberger-provided housing. *Id.* at 84:1–5.

Arredondo did not report the alleged sexual assault to Schlumberger or Elwood. *Id.* at 99:24–100:2. After June 23, Mitre continued to touch Arredondo at work. One day, Mitre pushed Arredondo inside a restroom and tried to touch and kiss Arredondo. *Id.* at 101:9–13. Arredondo also testified that Mitre forced her to meet her at Olive Garden for dinner by threatening Arredondo with the photos Mitre had taken on June 23. *Id.* at 102:12–20. Arredondo agreed to meet with Mitre. *Id.* When Mitre and Arredondo arrived at the restaurant, Carrasco was leaving the establishment. *Id.* at 107:3–10. Mitre and Carrasco got into an argument which resulted in Carrasco slapping Mitre. *Id.* After that, Mitre and Arredondo entered Olive Garden without Carrasco. *Id.* During dinner, Mitre tried holding Arredondo's hand. *Id.* After dinner, while Arredondo was getting inside her vehicle and closing the door, Mitre forcefully kissed Arredondo and "touched" her. *Id.*

The following day, Arredondo told Carrasco that she was not in a relationship with Mitre. *Id.* at 113:19–114:3. She informed Carrasco that Mitre threatened her with releasing the photos taken by Mitre on June 23. *Id.* Carrasco asked Arredondo about the pictures, and Arredondo relayed the alleged sexual assault to Carrasco. *Id.* Arredondo stayed in Carrasco's office throughout the workday, answering Carrasco's questions regarding Arredondo's encounters with Mitre. *Id.* at 114:17–116:3. Carrasco assured Arredondo that Arredondo would not lose her job and encouraged Arredondo to take two paid weeks off. *Id.* at 119:1–11, Arredondo Dep. P.II 6:9–25. Carrasco told Arredondo not to report the assault to HR because Arredondo "could lose her job[.]" *See* Arredondo Dep. 120:7–13.

After Arredondo reported the incident to Carrasco, but before Arredondo returned to work after taking two weeks off, Mitre called Arredondo and told her to delete all messages from her phone or risk getting fired. *Id.* at 185:2–15. Arredondo panicked and complied. *Id.* Mitre also found out that Arredondo might be pregnant from her husband and forced her to get a pregnancy test, stating that if Arredondo was pregnant, Mitre "was going to beat it out of [Arredondo]." *Id.* at 190:6–11. When Arredondo returned to work, Mitre continued to harass her, calling her a "wh*re" in front of other employees and yelling at Arredondo. *See* Arredondo Dep. P.II 8:21–9:12, 10:17–11:1. Some altercations resulted in Mitre throwing items at Arredondo but never striking Arredondo. *Id.* Although Mitre was not allowed to give Arredondo direction at work, she ordered Arredondo around. *Id.* at 12:12–17. Arredondo asked Carrasco if she could be sent into the field to be away from Mitre, but Carrasco told Arredondo that she could not work in the field. *Id.* at 11:16–12:6.

Arredondo complained to Carrasco, and no one else, about Mitre's conduct after Arredondo returned to work on July 10. *Id.* at 13:6–13. After that, Arredondo resigned to Grace Bol (Bol), Schlumberger's Field Service Manager, referencing the above-detailed harassment. *Id.* at 21:5–12. However, Bol told Arredondo that she did not want to hear Arredondo's complaint and accepted Arredondo's resignation. *Id.*

After Arredondo resigned, Carrasco called Arredondo and asked her if she wanted to return to work. *Id.* at 22:3–23:3. Carrasco also asked Arredondo to meet with her, and Arredondo agreed. *Id.* During their meeting, Carrasco told Arredondo that she was a good worker, and that Carrasco could have Bol retract Arredondo's resignation. *Id.* Arredondo declined Carrasco's offer. *Id.*

Arredondo notified Elwood of her resignation on July 31, citing sexual harassment as the reason for her resignation. *Id.* at 23:11–16; *see also* Niedermeyer Decl. Ex. 6-I. Elwood forwarded Arredondo's complaint to Schlumberger the same day. *See* Niedermeyer Decl. Ex. 6-I.

Mendha investigated Arredondo's allegations and concluded that Mitre and Arredondo were in a consensual relationship. *See* Defs.' Ex. 12. Mitre's behavior was found to have escalated and deemed inappropriate. *Id.* Mitre was released on August 15, 2018. *Id.* Because Mitre did not attend her termination meeting, she was fired for job abandonment, effective August 20. *See id.*

Arredondo did not seek a new assignment from Elwood because she was informed that Elwood was aware of similar conduct by Schlumberger supervisors. *See* Arredondo Dep. P.III 26:19–27:16.

## II.   PROCEDURAL BACKGROUND

Plaintiffs filed the instant lawsuit on August 10, 2020. (Doc. 1). In their Complaint, Plaintiffs allege that Defendants violated Title VII of the Civil Rights Act (Title VII) "by creating a hostile work environment . . . based on sex, race, and national origin." *Id.* at 25. They also allege that Defendants violated Title VII "by intentionally discriminating [and retaliating] against Plaintiffs because of their sex[.]" *Id.*

Defendants filed a Motion for Summary Judgment on October 4, 2021. (Doc. 27). Defendants argue that: Coleman cannot establish several elements of her claim for harassment against Defendants; Coleman's claims for discrimination and retaliation fail as a matter of law because Coleman cannot point to a comparator; Coleman's discrimination and retaliation claims against Elwood fail because Elwood did not take an adverse employment action; and that

Coleman cannot establish pretext. *Id.* at 9. Defendants also argue that: Arredondo cannot prove an adverse employment action through constructive discharge and so her claims for discrimination and retaliation fail; Arredondo's sexual harassment claim fails because she did not take advantage of Defendants' corrective procedures for reporting harassment; and that Arredondo cannot establish that Elwood knew or should have known about the alleged sexual harassment. *See id.* Plaintiffs respond that genuine issues of material fact exist for trial and urge the Court to deny the Motion for Summary Judgment. (*See* Docs. 31, 34).

### III.   LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must examine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the Court must consider the record as a whole by reviewing all pleadings, depositions, affidavits, and admissions on file, and drawing all justifiable inferences in favor of the party opposing the motion. *See Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002). The Court may not weigh the evidence or evaluate the credibility of witnesses. *Id.*

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

12

The nonmoving party cannot rest on the mere allegations of the pleadings to sustain this burden. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248. "After the nonmovant has been given an opportunity to raise a genuine factual issue, if no reasonable juror could find for the nonmovant, summary judgment will be granted." *Caboni*, 278 F.3d at 451. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

The admissibility of summary judgment evidence is subject to the same rules of admissibility applicable to a trial. *See Resol. Tr. Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995) (citing *Munoz v. Int'l All. of Theatrical Stage Emps. & Moving Picture Mach. Operators of the U.S. & Can.*, 563 F.2d 205, 297 n.1 (5th Cir. 1977)). Federal courts sitting in diversity apply state substantive law and federal procedural law. *See Shady Grove Orthopedic Ass'n, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 437 (2010) (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996)).

## IV.   DISCUSSION

Defendants move for summary judgment on Coleman's claims for discrimination and harassment based on sex, race, national origin, and retaliation. (Doc. 27 at 8–9). They also move for summary judgment as to Arredondo's claims for discrimination and harassment based on sex and retaliation. *Id.* The Court will begin with Coleman's claims.

### A.  Coleman's Claims

#### 1.  Discrimination Based on Sex

Coleman, a female, alleges she was discriminated against because of her sex by Mitre, another female employee. (Doc. 1). Accordingly, this case involves same-sex harassment under Title VII.

Under Title VII, employers may not discharge or discriminate against an individual based on the individual's sex. 42 U.S.C. § 2000e-2(a)(1). The inquiry is "whether the defendant intentionally discriminated against the plaintiff." *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983).

### a.  *Sexual Harassment*

"Sexual harassment is a form of discriminatory treatment, and applies in any situation where there is discrimination 'because of' sex, whether it be between members of the same or opposite sexes." *Cherry v. Shaw Coastal, Inc.*, 668 F.3d 182, 188 (5th Cir. 2012) (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998)). In deciding a same-sex sexual harassment claim, district courts in the Fifth Circuit first determine whether the alleged harasser's conduct was actually sex discrimination. *See Love v. Motiva Enters. LLC*, 349 F. App'x 900, 902 (5th Cir. 2009). Second, they analyze whether the conduct meets the standard for a *quid pro quo* or hostile work environment. *Id.*

Defendants do not challenge that the alleged harassment qualifies as "discrimination because of sex." (Doc. 27 at 10–19). Accordingly, the Court moves on to the second step of a same-sex sexual harassment claim.

Defendants argue that the alleged harassment was not severe or pervasive enough to affect a term or condition of Coleman's employment, challenging Coleman's contention that she was subjected to a hostile work environment. (Doc. 27 at 12–14). Moreover, Defendants maintain that Coleman waived any *quid pro quo* sexual harassment claim. (Doc. 32 at 1). Alternatively, Defendants argue that Mitre was not Coleman's supervisor; thus, she cannot have a claim for *quid pro quo* sexual harassment. *Id.*

### i.  *Hostile Work Environment*

The elements of a sexual harassment claim are: "(1) that the employee belongs to a protected class; (2) that the employee was subject to unwelcome sexual harassment; (3) that the harassment was based on [sex]; and (4) that the harassment affected a 'term, condition, or privilege' of employment." *Guadalajara v. Honeywell Int'l, Inc.*, 224 F. Supp. 3d 488, 497 (W.D. Tex. 2016) (alteration in original) (quoting *EEOC v. Boh Bros. Constr. Co. LLC*, 731 F.3d 444, 453 (5th Cir. 2013)). A defendant may raise the affirmative defense that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and "that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998)).

A term, condition, or privilege of employment is affected if the harassment is "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Aryain v. Wal-Mart Stores Tex. LP*, 534 F.3d 473, 479 (5th Cir. 2008). Frequent incidents of harassment, though not severe, can reach the level of pervasiveness required under Title VII. *See Lauderdale v. Tex. Dep't of Crim. Just., Institutional Div.*, 512 F.3d 157, 163 (5th Cir. 2007). Moreover, one egregious incident "can alter the terms, conditions, or privileges of employment and satisfy the fourth element . . . ." *Id.* (citing *Harvill v. Westward Commn'cs, LLC*, 433 F.3d 428, 434–35 (5th Cir. 2005)).

Coleman alleges that Mitre made the following remarks: she liked women with "big breasts and big butts shaped like [Coleman's];" she "would know what to do with a woman like [Coleman];" she and a female coworker had sex with the same women; and that she and a former employee went to strip clubs together. *See* Coleman Dep. 40:14–42:22. Mitre asked Coleman

whether she was bisexual roughly three times. *See id.* Mitre also patted Coleman on the shoulder and tried touching Coleman's hands while Coleman was building guns. *Id.*

Mitre's comments, alone, are not sufficiently severe to be actionable under Title VII. As to Mitre's statements to Coleman, the Fifth Circuit held that being subjected to "one subjectively offensive utterance . . . every few days" is not actionable under Title VII when the utterances "were not severe, physically threatening, or humiliating[.]" *See Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 330 (5th Cir. 2009) (citing *Shepherd v. Comptroller of Pub. Accts. of State of Tex.*, 168 F.3d 871, 874 (5th Cir. 1999)). Likewise, touching Coleman's hands and patting her shoulder is not severe as Mitre's actions did not "physically threaten [Coleman];" at most, the conduct was unwanted and offensive. *See Shepherd*, 168 F.3d at 874; *see also Paul v. Northrop Grumman Ship Sys.*, 309 F. App'x 825, 828 (5th Cir. 2009) ("The type of non-consensual physical touching alleged by [the plaintiff] was held to be actionable under Title VII only in cases where it was chronic and frequent.").

Mitre's actions—patting Coleman's shoulder and touching Coleman's hands—are also insufficiently pervasive or severe. *See Paul*, 309 F. App'x at 829. Under Fifth Circuit precedent, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *See Gibson v. Potter*, 264 F. App'x 397, 401 (5th Cir. 2008) (citations omitted); *see also West v. City of Hous., Tex.*, 960 F.3d 736, 742 (5th Cir. 2020) ("The alleged conduct must be objectively and subjectively hostile or abusive.").

In sum, Coleman does not raise a genuine issue of material fact for trial regarding the pervasiveness or severity of the alleged sexual harassment. For this reason, the Court finds that

Defendants are entitled to summary judgment as to Coleman's hostile work environment sexual harassment claim.

ii.   *Quid Pro Quo*

To establish *quid pro quo* sexual harassment, Coleman must have (1) suffered a tangible employment action, and (2) the tangible employment action must result from the acceptance or rejection of a supervisor's alleged sexual harassment. *See Russell v. Univ. of Tex. of Permian Basin*, 234 F. App'x 195, 201 (5th Cir. 2007) (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002)).

"A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Frensley v. N. Miss. Med. Ctr., Inc.*, 440 F. App'x 383, 386 (5th Cir. 2011) (quoting *La Day*, 302 F.3d at 481–82). "An individual is a 'supervisor' for the purposes of a *quid pro quo* claim if he or she has the authority to take a tangible employment action against the plaintiff." *Higgins v. Lufkin Indus., Inc.*, 633 F. App'x 229, 232 (5th Cir. 2015) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). "[A] plaintiff must show a 'causal nexus' between the acceptance or rejection of the sexual advances and the tangible employment action." *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009).

Defendants first argue that Coleman did not raise a *quid pro quo* sexual harassment claim; thus, the claim is waived. (Doc. 32 at 1). Coleman responds that the Complaint provides "fair notice" of her *quid pro quo* claim based on Mitre's conduct. (Doc. 34 at 1–3). Arguably, Plaintiffs' Complaint is wanting. (*See* Doc. 1). Nonetheless, Plaintiffs are not required to use

17

"magic words" to state a claim. *See Jackson v. Entergy Operations, Inc.*, No. Civ. A. 96-4111, 1998 WL 46822, at *2 n.1 (E.D. La. Feb. 4, 1998) (quoting *Portis v. First Nat'l Bank*, 34 F.3d 325, 332 n.14 (5th Cir. 1994)) ("Although the complaint does not use those words, a complaint need not outline all elements of a claim nor use any "magic words" to state a claim."). Accordingly, the Court rules that Coleman did not waive her *quid pro quo* sexual harassment claim. *See id.*

Next, Defendants argue that Mitre was not a supervisor; thus, Coleman's claim fails. (Doc. 32 at 1–2). Coleman does not respond to Defendants' argument.[7] (*See* Doc. 34 at 3–4). Coleman refers to Mitre as a supervisor but does not point to evidence to establish Mitre's status as a supervisor. (Doc. 31 at 10). Instead, Coleman argues that if the Court finds that Mitre was not a supervisor, Defendants "may still be liable," quoting First Circuit case law but failing to include a citation. (*See* Doc. 34 at 4).

A "supervisor" is defined as an employee who has the power to "take a tangible employment action," such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or causing a significant change in benefits. *Higgins*, 633 F. App'x at 232 (citing *Vance*, 570 U.S. at 430). As noted above, Coleman does not argue that Mitre had the authority to fire her. (Docs. 31, 34). Moreover, the summary judgment evidence suggests that Mitre did not have the power to fire Coleman or anyone else. *See* Bol Decl. at 1 (stating that Mitre "was one of the more senior gun loaders, but she was not a supervisor," nor did she have the "authority to hire or fire individuals"). Accordingly, Coleman cannot state a claim for *quid*

---

7. In her sur-reply, Coleman argues that the distinction between hostile work environment and *quid pro quo* claims is "of limited utility." (Doc. 34 at 3). She continues, arguing she has presented evidence regarding the fourth element of a hostile work environment claim. *Id.* The Court granted Coleman leave to file a sur-reply specifically limiting Coleman's sur-reply to the "waiver" issue. (*See* Text Only Entry, Nov. 9, 2021). Accordingly, Coleman's argument is stricken. However, even if the Court were to consider Coleman's argument, Fifth Circuit case law differentiates between the two claims. *See, e.g., Casiano v. AT&T Corp.*, 213 F.3d 278, 283 (5th Cir. 2000) (delineating a different course for analyzing *quid pro quo* and hostile work environment claims).

*pro quo* sexual harassment based on Mitre's alleged conduct. *See Beck v. Tex. Dep't of Crim. Just.*, No. 2:18-CV-218-Z-BR, 2020 WL 8298905, at \*5 (N.D. Tex. Nov. 23, 2020), *report and recommendation adopted*, No. 2:18-CV-218-Z, 2021 WL 272213 (N.D. Tex. Jan. 27, 2021) (holding that the plaintiff's sexual harassment claim could only proceed under the hostile work environment theory when the harasser was not a supervisor).

For this reason, summary judgment in Defendants' favor is warranted as to Coleman's *quid pro quo* sexual harassment claim based on Mitre's alleged conduct.

### b. *Disparate Treatment*

Coleman also appears to raise a disparate treatment claim based on sex. An employee may rely on direct or circumstantial evidence to establish a *prima facie* case of discrimination under Title VII. *See Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007). Coleman relies on circumstantial evidence to establish intentional discrimination. (*See generally* Doc. 31). Accordingly, the *McDonnell Douglas* burden-shifting analysis applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the *McDonnell Douglas* framework, the employee must first create a presumption of intentional discrimination by establishing a *prima facie* case. *Id.* Thereafter, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.*

> To establish a *prima facie* case for sex discrimination, [the plaintiff] must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by someone outside her protected class, or similarly situated employees outside the protected class were treated more favorably under nearly identical circumstances.

*Earle v. Aramark Corp.*, 247 F. App'x 519, 523 (5th Cir. 2007).

Here, Coleman belongs to a protected class—she is a woman. Moreover, Defendants do not dispute that she was qualified for the position of "gun loader trainee." (*See* Doc. 27). Rather, Defendants argue that Coleman cannot point to a comparator and that Elwood did not take adverse employment action against Coleman. (Doc. 27 at 19–21).

To establish the fourth element of a *prima facie* case, Coleman must show that someone outside her protected class replaced her or that a similarly-situated employee outside the protected class was treated more favorably. *See Earle*, 247 F. App'x at 523. Coleman need not show "identical" situations to establish that another employee was similarly situated. *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259–60 (5th Cir. 2009) (citations omitted). Instead, the Fifth Circuit only requires "nearly identical" circumstances. *Id.* Thus, Coleman's conduct must have been "nearly identical" to that of the proffered comparators who allegedly drew dissimilar employment decisions. *Id.* (citations omitted). "Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated." *Id.* (citation omitted). Additionally, "employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated." *Id.* (citation omitted).

Coleman does not argue that someone outside of her protected class replaced her. (*See generally* Doc. 31). Neither does Coleman point to a "similarly situated" employee, much less identify how any employee, in nearly identical circumstances, was treated more favorably than she. Critical to the fourth element is establishing that another employee was similarly situated

and treated more favorably. For this reason, Defendants are entitled to summary judgment on Coleman's disparate treatment sex discrimination claim.[8]

***

In sum, Defendants have shown an absence of a genuine issue of material fact as to Coleman's claims for discrimination based on sex. First, Coleman failed to present evidence establishing a genuine issue for trial regarding the severity or pervasiveness of the alleged sexual harassment, which is fatal to her hostile work environment claim. Second, Coleman failed to create a genuine issue of material fact for trial regarding Mitre's status as an employee rather than a supervisor; thus, her *quid pro quo* claim also fails.[9] Finally, Coleman does not present evidence regarding the fourth element of her disparate treatment claim. Consequently, the Court rules that Defendants are entitled to summary judgment on Coleman's sex discrimination claims.

Because Coleman does not establish a sex discrimination claim, the Court need not consider whether Elwood, who Coleman does not allege independently engaged in discrimination, is liable for the alleged discriminatory conduct of Schlumberger. *See, e.g.*, *Nicholson v. Securitas Sec. Servs., USA, Inc.*, No. 4:14-CV-172-O, 2016 WL 7669518, at *3 (N.D. Tex. Dec. 29, 2016) ("[A] defendant cannot be held liable for discrimination that has not occurred.").

### 2. Discrimination Based on Race

Coleman also raises a discrimination claim based on race. (*See* Doc. 1). Defendants argue that Coleman cannot show that the alleged conduct was severe or pervasive and that Schlumberger took prompt remedial action. (Doc. 27 at 14–19).

### a. *Hostile Work Environment*

---

8. Likewise, the Court need not address whether Elwood took adverse employment action against Coleman.
9. Seeing as the Court finds summary judgment appropriate based on the arguments addressed, the Court need not reach Defendants' alternative arguments concerning Coleman's sexual harassment claim.

Coleman's race discrimination claim is advanced under the hostile work environment theory. The elements of a hostile work environment claim based on race and sex have the same elements. Thus, to state a claim for race-based hostile work environment, Coleman must establish that: "(1) she belongs to a protected group; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (citations omitted). Harassment based on race affects a term, condition, or privilege of employment when it is sufficiently severe or pervasive to alter the condition of the victim's employment. *See id.* When the harassment is based on a supervisor's conduct, the plaintiff need only establish the first four elements. *See White v. Gov't Emps. Ins. Co.*, 457 F. App'x 374, 380 (5th Cir. 2012) (listing the elements of a hostile work environment claim).

Coleman argues that she was the only black female of fourteen or fifteen people who worked in the gun shop on the day shift, that Carrasco and Mitre regularly stated their dislike for black employees, that Carrasco and Mitre tried sending black employees to do work in the field, that Mitre uttered "f***ing n-word" in Spanish, that Coleman was never invited to lunch even though Hispanic female gun loaders were, that "black employees ate separately in the lunchroom," that Coleman was required to participate in cleaning and mopping and Arredondo was not, and that black male employees were assigned "harder, dirtier tasks." (Doc. 31 at 20–21).

As to Coleman's first allegation—that she was one of two black employees of a total of fourteen or fifteen employees on the day shift—the Court rules that, without more, this evidence

does not suggest race-based discrimination.[10] Likewise, the fact that Hispanic employees were the "dominant group" is not indicative, on its own, of racial animus.

Other evidence Coleman points to in support of her allegation suggests that Mitre and Carrasco "made derogatory comments towards [African-American]" employees, "yelled at them differently," and stated that "things were better before [African-Americans] went there." *See* Arredondo Dep. 148:10–23. Mitre also called black employees "f****ing n-word" and "monkey faces" and stated that black employees "smelled like s**t." *Id.* However, hostile work environment jurisprudence "does not prohibit all verbal or physical harassment in the workplace." *See Dediol v. Best Chevrolet, Inc.*, 655 F.3d 435, 443 (5th Cir. 2011) (citation omitted). Thus, Coleman's allegation that Mitre and Carrasco "regularly stated their dislike for black employees" is, on its own, insufficient to establish a hostile work environment. *See Anderson v. Sikorsky Support Servs., Inc.*, 66 F. Supp. 3d 863, 874 (S.D. Tex. 2014); *see also Baker v. FedEx Ground Package Sys., Inc.*, 278 F. App'x 322, 329 (5th Cir. 2008) *(*concluding that a supervisor's comments to African–American employee that "she did not want to work with people like" employee and that "whites rule" were not sufficiently severe to establish a race-based hostile work environment claim*)*.

Moreover, Coleman fails to argue that the above-detailed statements affected her job, much less explain how she was affected. *See EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 398 (5th Cir. 2007) (considering whether the conduct interferes with an employee's work performance).

Additionally, it is not clear how often the comments were made, as Coleman does not point to evidence regarding the frequency of the conduct. *See id.* ("To determine whether the

---

10. For example, there is no evidence suggesting that black applicants were denied employment in favor of applicants of a different race.

victim's work environment was objectively offensive, courts consider . . . the frequency of the discriminatory conduct . . . and whether it interferes with an employee's work performance"); *Elizondo v. Nueces Cnty., Tex.*, No. CC-07-405, 2009 WL 603010, at *8 (S.D. Tex. Mar. 7, 2009) ("While these statements and expressions of frustration from [defendant] are somewhat tactless, it is unclear how often he made them, and therefore whether the statements were 'severe or pervasive' enough to constitute a hostile work environment.").

Next, Coleman does not argue that she was present when the comments were made or that they were directed at her. *See Johnson v. TCB Const. Co., Inc.*, 334 F. App'x 666, 671 (5th Cir. 2009) (finding it crucial that the "frequent use" of the n-word was not directed at the plaintiff or uttered in the plaintiff's presence).

Similarly, it is relevant that the conduct Coleman complains of was not directed at her. *See Sikorsky Support Servs.*, 66 F. Supp. 3d at 874 (noting that the complained-of conduct occurred sporadically and was not directed at the plaintiff). Specifically, Arredondo testified that Carrasco and Mitre assigned African American employees "out of the way, dirtier jobs, more cleaning jobs," and that they were kept at work "longer than [Arredondo]." *See* Arredondo Dep. 151:1–8. According to Arredondo, when African American employees "[got] on [Mitre's or Carrasco's] nerves, they were sent to the back to wash trucks." *Id.* at 151:9–18. Coleman additionally claims that "black employees always ate separately in the lunchroom." *Id.* She relies on Arredondo's testimony to support her contention. *See id.* (citing Arredondo Dep. 182:9–183:21). However, Arredondo's testimony was that she, Mitre, Carrasco, and sometimes Echeverria would go to lunch; she "assum[ed]" that the other employees stayed in the shop during the lunch hour. *See* Arredondo Dep. 182:9–22, 183:3–6. According to Arredondo,

24

"African-American workers [ate] lunch together . . . in the shop" and were not invited to eat out by Hispanic employees. *See id.* at 183:11–18.

Assuming the above conduct took place, Coleman does not explain how it "undermine[d] [her] workplace competence." *Hackney v. Tex. Dep't of Crim. Just.*, No. 1:07CV113TH, 2009 WL 2391232, at *9 (E.D. Tex. Aug. 4, 2009) ("In plain terms, the court must look to 'whether the complained-of conduct undermined the plaintiff's workplace competence.'"). Coleman does not allege that these incidents upset her, that they were physically threatening, humiliating, or that they substantially interfered with her work performance. (*See* Doc. 31 at 19–21). Nor could she, seeing as there is no evidence suggesting that any of the above conduct was directed at her.[11] "To be actionable, the work environment must be 'both objective and subjectively offensive, one that a reasonable person would find hostile and abusive, *and one that the victim in fact did perceive to be so.*'"[12] *See Ryerson v. Berryhill*, No. 3:15-CV-3509-S-BK, 2018 WL 4103433, at *9 (N.D. Tex. Aug. 2, 2018), *report and recommendation adopted*, No. 3:15-CV-03509-S-BK, 2018 WL 4101842 (N.D. Tex. Aug. 28, 2018), *aff'd*, 772 F. App'x 102 (5th Cir. 2019) (emphasis added) (quoting *Faragher*, 524 U.S. at 787); *see also Buisson v. Bd. of Supervisors of La. Cmty. & Tech. Coll. Sys.*, 592 F. App'x 237, 246 (5th Cir. 2014) (finding that the plaintiff failed to offer evidence that her co-workers' "annoying acts or his bigoted comment prevented her from doing her job").

---

11. Notably, Arredondo testified that "they," referring to Coleman and herself, often had lunch at the shop and during one of those times, she had a conversation with Coleman regarding Coleman's salary. *See* Arredondo Dep. 153:8–12. Thus, even if some African American employees "always" had lunch "separately in the shop," it appears Coleman was accompanied by Hispanic co-workers on some occasions. *See id.*

12. Coleman argues that there is no case law suggesting that offensive comments must be directed at Coleman. (Doc. 31 at 21). There is case law, however, suggesting that whether the comments were directed at the plaintiff is relevant to a hostile work environment claim. *See, e.g.*, *TCB Const. Co.*, 334 F. App'x at 671 (noting that the racially charged comments were not directed at the plaintiff and concluding that the plaintiff's claims failed to offer evidence that he suffered from a racially hostile work environment); *see also McKenzie v. Milwaukee Cnty.*, 381 F.3d 619, 624 (7th Cir. 2004) ("Several of the incidents involved other female employees of the sheriff's office, and the impact of such 'second-hand' harassment is not as great as harassment directed at McKenzie herself.").

Coleman does complain of conduct directed at her. (Doc. 31 at 20). She alleges that she was not taught how to operate the overhead crane while Arredondo was, and that Arredondo was not required to participate in cleaning after the shift was over. *See* Coleman Dep. 30:13–31:11. Presumably, Coleman was required to clean after her shift. *See id.* However, there is no proof that this alleged harassment was physically threatening or humiliating, such as to make it severe. (Doc. 31 at 19–21). Neither does Coleman point to evidence of the pervasive nature of the alleged conduct. *Id.*

Finally, the Court notes that Coleman testified that Mitre spoke to "everyone" in a derogatory manner. *See* Coleman Dep. 61:6–10. Mitre was known to curse at the entire group of employees. *See id.* at 62:2–7. In Coleman's incident report dated June 30, 2018, Coleman stated that she believed that Carrasco and Mitre did not "know how to talk to [their] workers," suggesting that all workers were "curs[ed]" at and spoken to in a derogatory manner. *See* Niedermeyer Decl. Ex. 6-F. She indicated that Carrasco and Mitre spoke about "workers," criticizing their looks. *Id.* Mitcham's email, which Coleman cites, also suggests that Carrasco treated all employees poorly. *See* Pls.' Ex. 5f. Mitcham testified that Carrasco was "derogatory in her behavior" toward a white employee and that some of the people she spoke to at work complained about the way Carrasco "treated everyone." *See* Mitcham Dep. 34:19–35:16. This is further evidenced by Mitcham's report to HR, including complaints from Sonuga and Sigue regarding Carrasco's speaking to them *and* other employees in a "demeaning" and "derogatory" way. *See* Pls.' Ex. 5a. Thus, it appears Carrasco and Mitre treated all employees equally. "[O]ffensive harassment, shared equally by all, [is] not considered actionable discrimination." *See Vaughn v. Pool Offshore Co.*, 683 F.2d 922 (5th Cir. 1982); *see also Hill v. K-Mart Corp.*,

699 F.2d 776, 777 (5th Cir. 1983) (noting that a manager treated all assistant managers "equally—with measured disdain").

In sum, the alleged racially charged conduct Coleman complains of was not pervasive and did not reach the severity that Fifth Circuit precedent requires. Coleman also fails to offer evidence that she felt embarrassed or threatened or that the conduct complained of unreasonably interfered with her work performance. Because Coleman cannot show that Carrasco's or Mitre's behavior affected a term, condition, or privilege of employment, her hostile work environment claim fails. *See Collier v. Dall. Cnty. Hosp. Dist.*, 827 F. App'x 373, 378 (5th Cir. 2020), *cert. denied*, 141 S. Ct. 2657 (2021) (noting that the conduct was "not physically threatening, was not directed at [the plaintiff], and did not unreasonably interfere with his work performance"). Defendants are, therefore, entitled to summary judgment on Coleman's race discrimination claim under the theory of hostile work environment.

Because the Court determines that Coleman cannot establish the fourth element of her race discrimination claim under a hostile work environment theory, the Court need not consider Schlumberger's argument regarding whether it took prompt remedial action.

### b. *Disparate Treatment*

It is not entirely clear from Plaintiffs' Complaint whether Coleman raises a race discrimination claim based on disparate treatment. (See Doc. 1). However, to the extent that Coleman presents such a claim, it is addressed below.

As noted before in this Order, when a plaintiff relies on circumstantial evidence to establish a discrimination claim, the *McDonnell Douglas* framework applies. *See McDonnell Douglas Corp.*, 411 U.S. at 802. The elements are: "(1) she is a member of a protected class, (2) she was qualified for the position, (3) she suffered an adverse employment action, and (4) the

employer continued to seek applicants with the plaintiff's qualifications, the employer selected someone of a different race or sex, or that others similarly situated were treated more favorably than she." *Washington v. Veneman*, 109 F. App'x 685, 688 (5th Cir. 2004) (citation omitted).

Defendants argue that Coleman does not point to a comparator to establish the fourth element of a *prima facie* case for race discrimination. (Doc. 27 at 19–21). The Court agrees.

The establish the fourth element, Coleman must present evidence that someone outside her protected class replaced her or that a similarly situated employee outside the protected class was treated more favorably. *See Earle*, 247 F. App'x at 523. Coleman does not argue that someone outside of her protected class replaced her. (*See* Doc. 31). Moreover, the only person Coleman alleges was treated more favorably than she is Arredondo. (*See* Doc. 31 at 19–21). However, Arredondo was hired as a "gun loader," and Coleman was hired as a "gun loader trainee." *See* Niedermeyer Decl. at 1. Thus, Arredondo is not a proper comparator to determine whether someone similarly situated but outside Coleman's protected class was treated more favorably. *See Lee*, 574 F.3d at 259–60 (noting that employees with different work responsibilities are not similarly situated).

Accordingly, to the extent Coleman raises a claim for disparate treatment based on race, Defendants are entitled to summary judgment on said claim.

\*\*\*

In sum, Coleman does not create a genuine issue of material fact for trial regarding the severity or pervasiveness of the alleged race-based harassment she experienced. Neither does she present evidence that someone similarly situated was treated more favorably. For these reasons, summary judgment is warranted as to Coleman's race discrimination claims.[13]

---

13. It appears that Plaintiffs also raise a claim for discrimination based on national origin. (Doc. 1 at 25). Defendants lump together the race- and national origin-based claims in their Motion for Summary Judgment. (Doc. 27 at 14).

Because the Court finds that Coleman cannot establish a discrimination claim based on race, the Court need not determine whether Elwood is liable for Schlumberger's alleged discriminatory conduct. *See Nicholson*, 2016 WL 7669518, at *3.

### 3. Retaliation

A Title VII retaliation claim requires that Coleman "prove by [a] preponderance of the evidence '(1) that she engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action.'" *Evans v. City of Hous.*, 246 F.3d 344, 352 (5th Cir. 2001) (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996)).

#### a. *Schlumberger*

The summary judgment record shows that Coleman engaged in protected activity when she accused Mitre of sexual harassment and Mitre and Carrasco of race discrimination. Pls.' Ex. 5a. Accordingly, Coleman has proven by the preponderance of the evidence that she engaged in activity protected by Title VII. Moreover, Schlumberger does not dispute that it released/terminated Coleman. *See Long*, 88 F.3d at 306 (finding that termination is an adverse employment action). Thus, the only element in question is the third.

As to causal link, Coleman argues that a causal link exists between the protected activity and Coleman's termination. (Doc. 31 at 12). Coleman notes that she was terminated on June 28, the same day she met with HR and reported Mitre's and Carrasco's conduct. *Id.* And that her termination was based, in part, on Mitre's and Carrasco's statements. *Id.* at 13. Schlumberger counters that Coleman cannot solely base her causal link on temporal proximity. (Doc. 27 at 24–

---

Coleman does not specifically address the national origin claim. (*See* Doc. 31). Because Coleman does not argue that harassment was based on her national origin, the Court grants Defendants' Motion for Summary Judgment with regard to said claim. *See Ochoa v. Tex. Metal Trades Council*, 989 F. Supp. 828, 831 (S.D. Tex. 1997) (listing the elements of a discrimination claim based on national origin).

25). Moreover, it argues that Coleman cannot show that her termination was due to her protected activity. *Id.*

"A "causal link" is established when the evidence demonstrates that 'the employer's decision to terminate was based in part on knowledge of the employee's protected activity.'" *Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 684 (5th Cir. 2001) (quoting *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1121 (5th Cir. 1998)). The summary judgment record shows that the ultimate decision-maker, in this case, was Mendha. *See* Pls.' Ex. 5c. Mendha emailed Brandon Schlacht (Schlacht), a Sourcing Consultant for Schlumberger, ordering him to have Coleman's agency "release her" and to "assist in arranging her flight home." *Id.* At the time of her recommendation, Mendha was aware of Coleman's discrimination complaints against Mitre and Carrasco. This is evidenced by the email Mitcham sent Mendha on June 22, 2018. *See* Pls.' Ex. 5a. Mendha's knowledge, coupled with Coleman's termination at the conclusion of Mendha's investigation, the same day she spoke with Coleman regarding her complaint, establishes a causal link at the prima facie stage. *See Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 305 (5th Cir. 2020) (holding that close timing between an employee's protected activity and an adverse employment action against her may provide the causal link to make out a *prima facie* case when the temporal proximity is "very close"); *see also Medina*, 238 F.3d at 684 (finding a causal link where an employee showed that the supervisor who terminated him knew about the employee's complaint to the Texas Commission on Human Rights).

Accordingly, viewing the facts in the light most favorable to Coleman, the Court rules that she can establish a *prima facie* case for retaliation against Schlumberger. The burden of production now shifts to Schlumberger to articulate a legitimate, nondiscriminatory reason for its termination of Coleman.

### b.  *Elwood*

Elwood argues that Coleman cannot establish the first element of a retaliation claim because she never made an internal complaint with Elwood prior to her termination from Schlumberger. (Doc. 27 at 23). Moreover, Elwood argues that it took no action against Coleman that could be construed as an adverse employment action. *Id.* Coleman does not respond to Elwood's argument. (See Doc. 31).

Because Coleman does not allege that she engaged in protected activity under Title VII in relation to her retaliation claim against Elwood, nor that an adverse employment action occurred, the Court rules Coleman cannot establish a *prima facie* case of retaliation against Elwood. (Doc. 31 at 12–13). To the extent that Coleman argues she engaged in protected activity when she submitted the incident report to Elwood on July 2, 2018, Coleman does not argue or show that an adverse employment action followed. *See generally id.* She also fails to argue or show a causal link between her submission of the incident report and any adverse employment action. *See id.*

Consequently, the Court rules that Elwood is entitled to summary judgment on Coleman's retaliation claim.

### 4.  Legitimate, Nondiscriminatory Reason for Termination

Defendants argue that even if Coleman can establish a *prima facie* case for discrimination based on race or sex, Schlumberger had a legitimate, nondiscriminatory reason for terminating her—Coleman's violation of Schlumberger's policy. (Doc. 27 at 22). Coleman argues that a jury could find that Schlumberger did not believe that Coleman violated its policy. (Doc. 31 at 14).

Once a plaintiff establishes a *prima facie* case of discrimination or retaliation, the burden shifts to the defendant to "articulate a legitimate non[]discriminatory reason for the adverse

employment action." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). The Fifth Circuit recognized that violating company policy is a legitimate, nondiscriminatory reason for termination under Title VII. *See Thomas v. La., Dep't of Soc. Servs.*, 406 F. App'x 890, 896 (5th Cir. 2010) (citing *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001)).

Schlumberger's burden, at this stage, is one of production, no persuasion. *See Medina*, 238 F.3d at 684. Thus, Coleman's argument regarding whether Schlumberger truly believed she violated company policy is unpersuasive. Now the burden shifts back to Coleman to prove that Schlumberger's rationale for her termination was a pretext.

### 5. Pretext

If the defendant satisfies its burden, the plaintiff must "rebut the employer's purported explanation, to show that the reason given is merely pretextual." *Moss v. BMC Software, Inc.*, 610 F.3d 917, 922 (5th Cir. 2010) (citing *Jackson v. Cal-Western Packaging Corp.*, 602 F.3d 374, 378–79 (5th Cir. 2010)). "Plaintiffs must create a genuine issue of material fact under one of the alternative methods of proof[:]" mixed-motive or pretext. *Johnson v. BAE Sys. Land & Armaments, L.P.*, No. 3:12-CV-1790-D, 2014 WL 1714487, at *9 (N.D. Tex. Apr. 30, 2014). Coleman must show that she would not have been terminated "but for" engaging in protected activity to meet her burden. *See Medina*, 238 F.3d at 684. "But for" causation can be established using the "cat's paw" theory. *See Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 306 (5th Cir. 2020) (citation omitted). Under this theory, "but for" causation can be established "even if the ultimate decision-maker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus." *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017), *as revised* (Mar. 30, 2017).

Coleman does not contend that Mendha had a retaliatory animus. (Doc. 31). However, she argues that Mendha's recommendation to release Coleman was based on allegations made by Mitre and Carrasco, both of whom harbored retaliatory animus after Coleman reported them for sex- and race-based discrimination. (Doc. 31 at 16–19). Coleman concludes that she has established pretext under cat's paw theory. *Id.* Schlumberger argues that cat's paw theory is inapplicable because Coleman fails to present evidence that Mitre influenced Mendha's decision to release her. (Doc. 32 at 2).

The summary judgment record, and Schlumberger's own statement of facts, establish that Mendha's recommendation to terminate Coleman was based on allegations that Coleman "made inappropriate comments about lesbians, Hispanics, and Carrasco's weight." (Doc. 28-1 at 6–8). These allegations were made by Mitre, Carrasco, Arredondo, and Echeverria.[14] *Id.* Mendha determined that Coleman should be released to Elwood based on these reports. *Id.* Schlumberger asserts that "Coleman was released from her position because she made comments based upon individual's protected characteristics and as a temporary worker, Schlumberger's policy on progressive discipline did not apply." *Id.* at 8. These facts are sufficient to create a genuine issue of material fact for trial as to whether Mitre's and Carrasco's complaints regarding Coleman influenced Mendha's decision to terminate Coleman. *See Zamora v. City Of Hous.*, 798 F.3d 326, 331 (5th Cir. 2015) ("[A] plaintiff must show that the person with retaliatory animus used the decision-maker to bring about the intended retaliatory action.").

The Court finds that Coleman has produced sufficient evidence to show that Carrasco and Mitre, motivated by retaliatory intent, intended to cause, and did cause her termination. Accordingly, Schlumberger's Motion for Summary Judgment on the retaliation claim is denied.

## B. Arredondo's Claims

---

14. It is not relevant to the Court's analysis that Coleman disputes the allegations made against her.

Arredondo raises sex discrimination claims based on sexual harassment and retaliation against Elwood and Schlumberger. (Doc. 1). Schlumberger moves for summary judgment alleging it cannot be held responsible, under Title VII, for Mitre's alleged criminal conduct outside of work. (Doc. 27 at 25–28). For this reason, Schlumberger concludes that Arredondo's hostile work environment claim fails. *Id.* Schlumberger also argues that the *Faragher/Ellerth* defense bars Arredondo's sexual harassment claim. *Id.* at 29–32. Elwood argues Arredondo's sexual harassment claim is subject to summary judgment because Arredondo cannot show that Elwood knew or should have known of the harassment and failed to take prompt remedial action. *Id.* at 28–29. Finally, as to Arredondo's claims for disparate treatment and retaliation, Defendants argue that Arredondo was not constructively discharged because her resignation was unreasonable. *Id.* at 33–35.

### 1. Sexual Harassment: Hostile Work Environment

Arredondo's sexual harassment claim is premised on an alleged hostile work environment. Accordingly, the Court will analyze Arredondo's claim under the hostile work environment standard.

As stated before, to establish a sexual harassment claim based on a hostile work environment, Arredondo must show: (1) that she belongs to a protected class; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment affected a "term, condition, or privilege" of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *See Harvill*, 433 F.3d at 434. Because Arredondo's claim is based on Mitre's conduct and as more thoroughly explained below, the Court finds that Mitre was not Arredondo's supervisor,

34

Arredondo must establish all five factors. *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

### a. *Schlumberger*

#### i. *Whether the Alleged Harassment Affected Arredondo's Employment*

Schlumberger first argues that Title VII does not regulate sexual harassment outside the workplace. (Doc. 27 at 26). Schlumberger claims that, not considering the conduct that occurred outside of work, Arredondo's allegations are not sufficiently severe or pervasive to establish the fourth element of a hostile work environment claim based on sexual harassment. *Id.* at 27–28.

Arredondo alleges that, during work hours, Mitre insisted on Arredondo having lunch with her and other Schlumberger employees, grabbed her by the arm, pulled her, and dug her nails into Arredondo's arms. Mitre would also push Arredondo on "almost" a daily basis. Mitre pushed Arredondo inside a restroom on one occasion and tried to touch and kiss Arredondo. Another time, Mitre called Arredondo a "wh*re" in front of other employees and yelled at Arredondo. She also threw items in Arredondo's direction on different occasions.

Outside of work, Mitre tried to touch Arredondo's leg and hold her hand during lunch. Mitre also pushed Arredondo up against a wall and kissed her, sexually assaulted Arredondo, forced Arredondo to meet her for dinner, attempted to kiss Arredondo at Olive Garden, asked Arredondo to delete messages from her phone, forced Arredondo to get a pregnancy test, and threatened Arredondo to keep Arredondo from reporting Mitre's conduct.

"[E]mployers are not tasked with the duty of policing all employee behavior in and outside of the workplace." *Chapa v. El Paso Indep. Sch. Dist.*, No. EP-09-CA-230-FM, 2009 WL 10698730, at *7 (W.D. Tex. Sept. 22, 2009). However, several circuits have held that "harassment does not have to take place within the physical confines of the workplace to be

actionable; it need only have consequences in the workplace." *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008) (citing *Doe v. Oberweis Dairy*, 456 F.3d 704, 715–16 (7th Cir. 2006)). The Sixth Circuit noted that most courts agree that an employer is not responsible for harassment "perpetrated by a non-supervisory employee after work hours and away from the workplace setting," but acknowledged that if the employee subject to harassment "is forced to work for, or in close proximity to, someone who is harassing her outside the workplace, the employee may reasonably perceive the work environment to be hostile." *Duggins ex rel. Duggins v. Steak'N Shake, Inc.*, 3 F. App'x 302, 311 (6th Cir. 2001) (citations omitted); *accord Roy v. Correct Care Sols., LLC*, 914 F.3d 52, 63 n.4 (1st Cir. 2019) ("Courts . . . permit evidence of non-workplace conduct to help determine the severity and pervasiveness of the hostility in the workplace as well as to establish that the conduct was motivated by gender." (quoting *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 409 (1st Cir. 2002))).

Arredondo has presented evidence that she perceived her work environment to be hostile. Specifically, she informed Carrasco about the assault and asked if she could be placed in the field, away from Mitre. Her request was denied. Arredondo has thus presented evidence of a subjectively hostile work environment.

Moreover, Arredondo's sexual assault is severe enough to establish an objectively hostile work environment. The sexual assault coupled with Mitre's continued harassment at work, including forcing Arredondo to have lunch with her, digging her nails into Arredondo's arms, pushing Arredondo around on an almost daily basis, pushing her inside a restroom in an attempt to kiss and touch Arredondo, and subjecting her to humiliation in front of other employees is sufficient to raise a genuine issue of material fact for trial regarding whether the alleged sexual

harassment was sufficiently severe or pervasive to affect a "term, condition, or privilege" of Arredondo's employment.

> ii.    Faragher/Ellerth *Affirmative Defense*

Schlumberger next argues that the *Faragher/Ellerth* defense bars Arredondo's hostile work environment claim. (Doc. 27 at 29–25). Arredondo responds that Schlumberger cannot raise the affirmative defense because (1) Mitre was her supervisor and (2) Mitre's harassment resulted in a tangible employment action. (Doc. 31 at 29–33).

Before reaching the *Faragher/Ellerth* defense, "courts must first determine whether the company took a tangible employment action against the employee." *See Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 331 (5th Cir. 2012). "The defense is unavailable if the employer has done so." *See id.* (citations omitted). Arredondo claims she was constructively discharged. "In determining whether an employer's actions constitute a constructive discharge, we ask whether 'working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Aryain*, 534 F.3d at 480 (citations omitted) (alteration in original). In the context of sexual harassment, the plaintiff must present more than what is required to establish a hostile work environment. *See id.* (citations omitted).

Arredondo claims that she was constructively discharged because her job responsibilities were reduced, she was reassigned to menial and degrading work, and badgered, harassed, and humiliated such that she had no choice but to leave her employment with Schlumberger. (Doc. 31 at 33). Whether an employee felt forced to resign is case-specific, but the Fifth Circuit typically considers the following factors: "(1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger [or less experienced/qualified] supervisor; (6) badgering, harassment, or

humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement [or continued employment on terms less favorable than the employee's former status]." *Owens v. Univ. of Tex. at Tyler*, No. 6:20-CV-00372-JDK-JDL, 2020 WL 8093573, at *7 (E.D. Tex. Dec. 7, 2020), *report and recommendation adopted*, No. 6:20-CV-372-JDK, 2021 WL 111501 (E.D. Tex. Jan. 12, 2021) (citing *Haley v. All. Compressor LLC*, 391 F.3d 644, 649–50 (5th Cir. 2004)). Taking the facts in the light most favorable to Arredondo, the Court rules that a reasonable employee in her position would not have felt compelled to resign for the reasons explained below.

In *Aryain*, the Fifth Circuit held that the plaintiff's allegations were insufficient to establish a constructive discharge. *Id.* The plaintiff alleged that her responsibilities were reduced because she was placed in a position that reduced her interaction with customers. *Id.* She also claimed that after she was transferred, she was charged with menial or degrading work because her supervisors had her break down clothing racks and move those clothing racks to the back of the store. *Id.* This was considered challenging work assigned to male employees during the night shift. *Id.* Finally, the plaintiff claimed that she was badgered, although there was no evidence that the sexually offensive conduct was meant to encourage the plaintiff's resignation. *Id.* The plaintiff, in that case, was denied breaks, was left out of the work schedule, was left waiting for hours before she could talk to supervisors, was laughed at, and talked about by co-workers. *Id.*

To meet her burden, Arredondo is required to present "more than what is required to establish a hostile work environment." *See id.* Arredondo claims that after she reported Mitre's harassment, she was not allowed to do modules. (Doc. 31 at 33). Instead, Arredondo was assigned "the most physically demanding assignment." *Id.* The other conduct Arredondo complains of to establish constructive discharge is the same evidence she cited to establish her

hostile work environment claim. *Id.* In sum, the behavior Arredondo claims she was subjected to, in addition to the allegations she relies on to establish a hostile work environment, does not reach the level required to show a constructive discharge claim. *See Aryain*, 534 F.3d at 481. Accordingly, Arredondo does not have a claim for constructive discharge. *See id.*

Arredondo also claims that the *Faragher/Ellerth* defense does not apply because Mitre was her supervisor. (Doc. 31 at 30). According to Arredondo, there is enough evidence from which a jury could find that Mitre "was a supervisor, acted with [the] apparent authority of a supervisor, and that [Arredondo] reasonably understood her to be a supervisor." *Id.* However, the evidence Arredondo highlights does not suggest that Mitre had the power to effect "significant change in [Arredondo's] employment status," such as hiring, firing, failing to promote, reassigning with significantly different responsibilities, or making a decision causing a significant change in benefits. *See Vance*, 570 U.S. at 424. The Supreme Court specifically rejected tying "supervisor status to the ability to exercise significant direction over another's daily work," finding instead that an employee is a supervisor only if the employee is empowered "to take tangible employment actions against the victim." *Id.*

Consequently, the Court rules Schlumberger is not barred from raising the *Faragher/Ellerth* affirmative defense.

To satisfy its affirmative defense, Schlumberger must now show by a preponderance of the evidence that (1) "the employer exercised reasonable care to prevent and correct prompt and sexually harassing behavior and" (2) "that the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *See Aryain*, 534 F.3d at 482 (citations omitted).

To establish the first prong, an employer may implement "suitable institutional policies and educational programs regarding sexual harassment." *Boh Bros. Const. Co.*, 731 F.3d 444, 462–63 (5th Cir. 2013) (citation omitted).

Here, it is undisputed that Schlumberger had an anti-harassment policy that included avenues for employees to report discrimination, harassment, and retaliation complaints. *See* Niedermeyer Decl. Ex. 6-E. The policy explains that Schlumberger prohibits "sexual harassment and harassment based on race, color, religion, age, national origin, citizenship, veteran status, disability or other characteristic protected by applicable federal state or local law." *Id.* The policy defines sexual harassment.[15] *Id.* The policy informs employees that they "may make a complaint regarding incidents experienced personally or observed in the workplace" and that it is their responsibility "to bring complaints to the Company's attention so that the Company can resolve them." *Id.* Employees are cautioned against assuming that Schlumberger "is aware of inappropriate conduct which the employee has witnessed or experienced." *Id.* Finally, Schlumberger details the procedure for reporting sexual harassment. *See id.*

Arredondo signed an acknowledgment of the harassment-free workplace policy during onboarding on April 25, 2018. *Id.* In the acknowledgment, Arredondo agreed that she had read and fully understood Schlumberger's policy on sexual harassment. *See* Niedermeyer Decl. Ex. 6-

---

15. Sexual harassment is defined as:

> a. Sexual conduct that unreasonably interferes with another person's work performance and creates an intimidating, hostile or offensive work environment.
> b. Personnel decisions (e.g., promotion, salary adjustments, evaluations, discipline, etc.) made by a supervisor on the basis of an employee's submission to or rejection of sexual advances.
> c. Submission to sexual conduct as an explicit or implicit term or condition of an individual's employment.

*See* Niedermeyer Decl. Ex. 6-E.

E. Further, Arredondo indicated that she understood that she was to report "all violation or suspected violations" of the policy to Schlumberger management. *Id.*

Arredondo argues, however, that other employees were not trained on the sexual harassment policy. (Doc. 31 at 31). Specifically, Arredondo points to Mitre's deposition testimony. *Id.* Mitre testified that she started working for Schlumberger in 2016 but had never had sexual harassment training prior to the training conducted because of Coleman's complaints of harassment in June 2018. *See* Mitre Dep. 32:21–23, 67:13–16. Schlumberger, who has the burden of establishing its affirmative defense, presents no evidence that Mitre or any other employee for that matter (other than Plaintiffs) were provided with or were aware of the sexual harassment policy. (*See* Docs. 27, 34). Neither does Schlumberger argue that employees had any education or training on its sexual harassment policy. *See id.* These facts are relevant to whether Schlumberger implemented education programs regarding sexual harassment. *See Winchester v. Nationwide Mut. Ins. Co.*, No. 3-09-CV-1225-M-BD, 2011 WL 913245, at *1 (N.D. Tex. Mar. 15, 2011) (holding that *Lauderdale* suggests that "both the institutional policies *and* educational programs are required" (emphasis added)); *Ray v. Dufresne Spencer Grp, LLC*, No. 1:17-CV-71-RP, 2019 WL 97029, at *10 (N.D. Miss. Jan. 3, 2019) (finding that the employer carried the burden of establishing its employees (other than the plaintiff) were aware of its sexual harassment policy). For this reason, the Court holds that Arredondo presented evidence that creates a genuine issue for trial as to the first prong of Schlumberger's affirmative defense.[16]

In sum, Schlumberger's sexual harassment policy is detailed and provides a procedure for reporting sexual harassment. However, there is a genuine issue of material fact as to whether Schlumberger trained its employees and supervisors, reviewed the sexual harassment policies

---

16. The two prongs of the *Faragher/Ellerth* affirmative defense are conjunctive; thus, the Court need not address the second prong. *See Boh Bros. Const.*, 731 F.3d at 466.

with its employees and supervisors, or trained its employees or supervisors on the policies. *See, e.g.*, *Davila v. Webb Cnty.*, No. 5:12-CV-42, 2014 WL 12600791, at \*7 (S.D. Tex. Sept. 23, 2014) (denying summary judgment on the *Faragher/Ellerth* defense where the employer's policies were defective and training was lacking); *see also Winchester*, 2011 WL 913245, at \*1 ("Although Nationwide presented evidence that its anti-harassment policy is available to its employees through an intranet website, Nationwide directed the Magistrate Judge to no evidence that Winchester, or any other employee, received any guidance or training on the policy."); *Amie v. City of Jennings, La.*, No. 2:03 CV 2011, 2005 WL 1788068, at \*2 (W.D. La. July 26, 2005) (considering lack of training on harassment).

Consequently, the Court denies Schlumberger's Motion for Summary Judgment regarding Arredondo's hostile work environment claim premised on sexual harassment.

### b. *Elwood*

Elwood argues that Arredondo's hostile work environment claim against it fails because Arredondo never notified Elwood of Mitre's alleged sexual harassment until after Arredondo resigned. (Doc. 27 at 28). Thus, Elwood concludes that it did not know about the harassment. *Id.*

Arredondo responds that Elwood "had explicit knowledge of Arredondo's harassment and constructive discharge." (Doc. 31 at 35). Arredondo points to evidence of Fish's emails indicating that Coleman had previously reported sexual harassment by Mitre. *Id.* The Court rules that knowledge of Coleman's complaint of harassment does not establish "knowledge" of Arredondo's complaint. *See Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 656 (5th Cir. 2012) (finding there was no evidence of actual knowledge when the employer was not informed of any of the incidents which were the basis of the plaintiff's harassment claim). Rather, to hold Elwood liable for sexual harassment by Mitre, Arredondo must show that Elwood knew or

should have known "*of the harassment in question* and failed to take prompt remedial action." *Pullen v. Caddo Par. Sch. Bd.*, 830 F.3d 205, 213 (5th Cir. 2016) (emphasis added).

There is also no evidence of constructive knowledge. In particular, Arredondo does not allege that Elwood's supervisor or managers witnessed the harassment Arredondo complains about, nor that anyone besides Coleman had reported sexual harassment by Mitre to Elwood. *See Willis v. Pilgrim's Pride Corp.*, No. 9:14-CV-71, 2016 WL 7157504, at *4 (E.D. Tex. Dec. 7, 2016) ("[A]n employer may have constructive knowledge when the harassment is pervasive.").

Finally, "[a] holding that an employer had constructive knowledge will be less likely if it had in place a procedure by which employees could report instances of harassment." *See Hernandez*, 670 F.3d at 656. Here, Arredondo does not dispute that it did not follow Elwood's procedure for reporting sexual harassment. (*See* Doc. 31 at 35–36).

In sum, the Court finds that Arredondo failed to bring forth evidence that creates a genuine issue of material fact for trial as to the fifth element of her hostile work environment claim against Elwood. Accordingly, the Court grants Elwood's Motion for Summary Judgment on Arredondo's hostile work environment claim.

## 2.  Disparate Treatment & Retaliation

Finally, Defendants move for summary judgment on Arredondo's retaliation and disparate treatment claims. (Doc. 27 at 33–35). Defendants argue that Arredondo cannot establish an adverse employment action occurred. *Id.* Disparate treatment and retaliation claims require that Arredondo establish, in part, that she suffered an adverse employment action. *See Earle*, 247 F. App'x at 523; *accord Evans*, 246 F.3d at 352. Here, Arredondo claims she was constructively discharged. (*See* Doc. 31). For the reasons previously stated in this order, the Court finds that Arredondo cannot establish that she was constructively discharged. Thus, her

claims for disparate treatment and retaliation against both Defendants do not survive summary judgment.

## V.   CONCLUSION

After due consideration, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Judgment. (Doc. 27).

The Court **GRANTS** summary judgment in Elwood's favor on both Plaintiffs' claims.

The Court further **GRANTS** summary judgment in Schlumberger's favor on Coleman's sex discrimination claims.

The Court further **GRANTS** summary judgment in Schlumberger's favor on Coleman's race and national origin discrimination claims.

The Court further **GRANTS** summary judgment in Schlumberger's favor on Arredondo's retaliation and disparate treatment based on sex claims.

The Court finally **DENIES** Schlumberger's Motion for Summary Judgment on Coleman's claim for retaliation and Arredondo's claim for hostile work environment sexual harassment.

It is so **ORDERED**.

SIGNED this 1st day of February, 2022.

DAVID  COUNTS
UNITED STATES DISTRICT JUDGE